| | | | |
|---|---|---|---|
| RAUL SALAZAR GARCIA, | ) | | |
| | ) | | |
| Petitioner, | ) | No. 14 C 09644 | |
| | ) | | |
| v. | ) | | |
| | ) | Judge Edmond E. Chang | |
| EMELY GALVAN PINELO, | ) | | |
| | ) | | |
| Respondent. | ) | | |

## MEMORANDUM OPINION AND ORDER

Petitioner Raul Salazar Garcia, a resident of Mexico, filed this petition against Respondent Emely Galvan Pinelo, a resident of Chicago, for return of the parties' minor son, D.S., to Mexico.[1] R. 30, Am. Petition. The parents, who were never married, agreed to allow D.S. to attend school in Chicago for one school year (though they disagree as to the scope of that agreement, as detailed later). But after that year, the parents disagreed as to whether D.S. would remain in Chicago or return to Mexico. In July 2014, Galvan refused to allow D.S. to travel back to Mexico with Salazar. Salazar then filed this petition for wrongful retention under the Hague Convention on Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, and its implementing legislation, the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 *et seq.*[2]

---

[1]The Court has subject-matter jurisdiction over this ICARA case under 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331. Citations to the docket are "R." followed by the entry number and, when necessary, the page or paragraph number.

[2]The statute was previously codified at 42 U.S.C. § 11601 *et seq.*

Salazar has moved for summary judgment on his petition. R. 54, Mot. Summ. J. For the reasons discussed below, Petitioner's motion is granted in part, denied in part, and reserved in part. An evidentiary hearing—basically, a bench trial—is needed on one narrow factual issue, described more fully below. As discussed when setting the briefing schedule on this motion, the hearing will be held on Friday, August 21, 2015 at 10:15 a.m. R. 53, July 6, 2015 Minute Entry. There is also one open legal issue that requires a translation of the custody order from Nuevo Leon, Mexico. *See* R. 69, Aug. 13, 2015 Minute Entry. The Court will decide that issue in its final opinion on the merits of the petition after the bench trial.[3]

## I. Background

In deciding summary judgment, the Court views the evidence in the light most favorable to the non-movant, Galvan. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Salazar and Galvan are the parents of D.S., who was born in Monterrey, Nuevo Leon, Mexico, in October 2002. R. 55, Pet.'s SOF ¶ 3.[4] Salazar and Galvan were never married. R. 49, Salazar Dep. at 19:3-4. In 2006, a court in Monterrey, Nuevo Leon entered a custody order concerning D.S. Pet.'s SOF ¶ 7; R. 30-1, Pet.'s Exh. B, Nuevo Leon Order (Spanish-language version). That order gave Galvan physical custody of D.S. and provided Salazar with weekly visitation. Salazar Dep. at 19:13-20:10. Aside from a few instances every year when Salazar was traveling for work, he visited D.S. in accordance with

---

[3]Respondent also raises the issues of fees and costs in her response. R. 66, Resp.'s Br. at 15. The Court reserves this issue until after the resolution of the petition for return.

[4]Facts drawn from the Petitioner's Statement of Facts are undisputed unless otherwise noted.

the custody order. Pet.'s SOF ¶ 8; *see also* Salazar Dep. at 24:1-7 ("Q. Was there ever a Wednesday night or a Sunday on which travel for work prevented you from seeing [D.S.]? A. Well, it actually happened only maybe once or twice a year."). For most of his childhood, D.S. lived in Monterrey with his mother. Pet.'s SOF ¶ 4.

In late 2012, Galvan asked Salazar to help her get a passport and visa for D.S. to travel to the United States. R. 50, Galvan Dep. at 13:13-18:1; Salazar Dep. 32:3-21. At the time, Galvan wanted to go to Texas to visit relatives and to take D.S. to Disney World or Disneyland. Galvan Dep. at 20:9-16. She told Salazar about her travel plans. *Id.*; Salazar Dep. at 32:3-14; Pet.'s SOF ¶¶ 10-12. At some point after the parties secured D.S.'s travel documents, Galvan decided that she wanted to move to the United States with D.S. Galvan Dep. at 20:21-21:14. On July 30, 2013, Galvan and D.S. met with Salazar in a Monterrey Starbucks to discuss the move.[5] *Id.* at 21:24-23:7; Salazar Dep. at 35:3-9; Pet.'s SOF ¶ 14. At this meeting, Salazar and Galvan agreed that D.S. would live with his mother in Chicago for one school year. Pet.'s SOF ¶¶ 5, 15; R. 65, Resp.'s Resp. Pet.'s SOF ¶ 15. But the parties now dispute the scope of the agreement, specifically on the issue of what would happen after the school year was over. Pet.'s SOF ¶¶ 5, 15; Resp.'s Resp. Pet.'s SOF ¶ 15. Salazar believes that the parties agreed to let D.S. himself decide where D.S. wanted to live after the school year was up. Salazar Dep. at 35:14-36:7, 37:5-9. D.S. testified that his parents agreed to let him decide where to live at the end of the school year. R. 52, First In-Camera Hrg. Tr. at 5:9-7:21. In contrast to Salazar's and

---

[5]On July 5, 2013, Galvan had married an American citizen who lived in Illinois. Pet.'s SOF ¶ 13.

D.S.'s version, Galvan argues that they did not agree to simply leave it up to D.S. to decide: specifically, Galvan believes that they agreed that D.S. would live in Chicago for the school year and then, at the end of the year, they would discuss whether D.S. would stay in Chicago. Galvan Dep. at 26:23-27:9 ("Q. And if [D.S.] wanted to go back, what was going to happen? A. We were going to talk about it. Q. And if [D.S.] wanted to stay here, what was going to happen? A. We would talk about it."); Resp.'s Resp. Pet.'s SOF ¶ 15.

On August 15, 2013, Galvan and D.S. moved to Chicago, and D.S. enrolled in school here. Resp.'s Resp. Pet.'s SOF ¶ 5. To keep in touch with his father, D.S. set up a Skype account. Galvan Dep. at 36:6-14. Salazar and D.S. would often communicate through Skype and Facebook. *Id.* at 36:12-19, 45:2-10; Salazar Dep. at 39:18-23, 42:17-43:1, 47:4-13, 52:10-17. And for Christmas 2013, D.S. returned to Mexico for more than one week to spend the holiday with his father. Galvan Dep. at 35:16-36:5. During D.S.'s conversations with his father over the course of the year, D.S. expressed that he wanted to return to Mexico. Salazar Dep. at 39:8-23, 41:15-43:1; First In-Camera Hrg. Tr. at 10:24-13:11. At the same time, D.S. was telling his mother that he wanted to stay in Chicago. First In-Camera Hrg. Tr. at 13:12-14:1; Salazar Dep. at 41:15-23.

At the end of the school year (in around July 2014), Salazar came to Chicago to see D.S. Pet.'s SOF ¶ 16. In light of the content of the conversations with his son throughout the school year, Salazar was prepared to take D.S. back to Mexico with him and had a plane ticket for D.S. *Id.* Neither Salazar nor D.S. had told Galvan of

their plan to return to Mexico; she believed that Salazar was just in Chicago to visit D.S. Galvan Dep. at 36:20-37:9; Salazar Dep. at 41:15-23; First In-Camera Hrg. Tr. at 13:12-14:1. Salazar and D.S. spent several days together sightseeing in Chicago. Salazar Dep. at 38:11-39:2. On July 21, 2014, Salazar, Galvan, and D.S. met in another coffee shop (yet again, a Starbucks) to discuss where D.S. was going to live. Pet.'s SOF ¶ 17. It was at that time that D.S. told his mother that he wanted to return to Mexico. *Id.* ¶ 18. Perhaps because D.S. had been telling her that he wanted to stay in Chicago, Galvan did not believe that D.S. truly wanted to return to Mexico. Galvan Dep. at 41:16-42:11. She thought D.S.'s father had influenced the child's decision. *Id.* The parents' accounts of what happened next differ, but they agree that it ended with D.S. leaving the coffee shop with Salazar, but then the Chicago police eventually instructed Salazar to return D.S. to Galvan's home. Galvan Dep. at 48:16-21, 51:23-52:23; Salazar Dep. at 44:1-46:12.

After this meeting, Salazar returned to Mexico without D.S. He immediately submitted his petition for return of the child to the Mexican Central Authority. Am. Petition ¶ 23. The petition was transmitted to the United States Department of State, and this petition was filed on December 2, 2014. R. 1, Petition. A guardian *ad litem* was appointed to represent the interests of D.S.[6] R. 25, Feb. 18, 2015 Minute Entry. Initially, D.S. did not want to express a preference as to where he would live.

---

[6]The Court expresses its sincere gratitude to Ms. Colleen Littmann and the Cook County Public Guardian for their dedicated representation of D.S., particularly outside the Cook County Circuit Court system. The Court also thanks counsel for both Petitioner and Respondent for their *pro bono* service to their clients. Both sides' lawyers and Ms. Littmann have lived up to the highest ideals of the legal profession.

*See* R. 65-7, Guardian Report at 1-2. In late April 2015,[7] however, D.S. changed his mind: he told his guardian that he wanted to stay in the United States. *Id.* at 2-3.

After D.S. decided that he wanted to express a preference, the Court conducted an in-camera hearing with D.S.[8] *See generally* R. 52, First In-Camera Hrg. Tr. At that hearing, D.S. told the Court that he wanted to stay in Chicago because it had better schools and more opportunities than Monterrey, it was safer than Mexico, and he did not want his mom to have to pay his dad's court costs and fees. *Id.* at 23:3-25:10. D.S. wanted to finish eighth grade in the United States and then, if he did not get into a good high school, possibly return to Mexico. *Id.* at 27:9-20. Although he said that he would miss his mother, baby sister (Galvan's child with her husband, so D.S.'s half-sister), and friends if he had to return to Mexico, D.S. said that he did not object to going back. *Id.* at 30:18-32:17.

During the course of summary-judgment briefing, Galvan's counsel asked the Court to hold a second in-camera hearing with the child. R. 58, Resp.'s Emergency Mot. The second hearing was prompted by immigration-law advice: Galvan's attorney had secured an immigration lawyer for Galvan and D.S., and the immigration lawyer had given Galvan information about her immigration status that counsel believed would change D.S.'s mind (and his testimony). *Id.* at 2-3. The

---

[7]Petitions for return under the Hague Convention are to be addressed as expeditiously as possible. *See* Hague Convention art 11. The Court acknowledges that appointment of counsel for Respondent, settlement negotiations, and summary-judgment briefing have consumed more time than is ideal, but given the importance of this dispute in the life of D.S. and his parents and family, the Court has authorized these delays to ensure that it reaches the most accurate outcome in this case.

[8]The parties agreed that D.S.'s in-camera testimony would stand-in for trial testimony of the child. The hearing was conducted in English at the child's request.

Court ordered that the immigration lawyer should meet with D.S. and his guardian *ad litem* to communicate the new information to D.S. R. 60, Aug. 5, 2015 Minute Entry. Over Salazar's objection, the Court decided to hold a second in-camera hearing with the child. *Id.* In that hearing, D.S. told the Court that he now objected to returning to Mexico. R. 62, Second In-Camera Hrg. Tr. at 12:16-25. D.S. gave several reasons for his objection, R. 65-11, D.S. Pros and Cons List, but he told the Court that, if his mother could freely travel between the United States and Mexico, he would no longer object, Second In Camera Hrg. Tr. at 16:7-17:5 ("Q. And let's assume … [that Galvan] could have a green card in six months and she could travel back and forth so that she could visit Mexico. … [W]ould that change your mind about objecting to being ordered to return to Mexico to live there? … A. Yeah, it would probably change my mind about going back.").

## II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and

must consider only evidence that can "be presented in a form that would be admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

"Although the federal courts normally have nothing to do with child custody issues, there is an exception for cases that arise under [ICARA], which implements the Hague Convention." *Norinder v. Fuentes*, 657 F.3d 526, 529 (7th Cir. 2011). "The Hague Convention is an anti-abduction treaty." *Redmond v. Redmond*, 724 F.3d 729, 739 (7th Cir. 2013). Its purpose is "to secure the prompt return of children wrongfully removed or retained in another signatory State."[9] *Id.* (quoting Hague Convention art. 1) (internal quotation marks omitted). "To this end, the Convention employs a remedy of return, which entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of habitual residence." *Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015) (internal quotation marks and citations omitted). "A court's role in enforcing the Convention is not to settle a custody dispute between

---

[9] Both the United States and Mexico are signatories of the Hague Convention. *See* http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html (visited August 16, 2015).

the parties, but rather to restore the status quo prior to any wrongful removal or retention." *Id.* (internal quotation marks omitted). "The court's task is to simply determine which country is the proper forum for that custody determination." *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006).

"The central question in any petition seeking the return of a child under the Hague Convention and ICARA is whether the child who is the subject of the petition has been 'wrongfully' removed or retained within the meaning of the Convention." *Redmond*, 724 F.3d at 737. Under the Convention, a removal or retention is wrongful where (a) "it is in breach of rights of custody attributed to a person, an institution[,] or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention"; and (b) "at the time of removal or retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention art. 3.

Interpreting this language, courts have established a series of four questions to determine if a removal or retention was wrongful: "(1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?" *Redmond*, 724 F.3d at 737-38 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006); *Mozes v.*

*Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001)). The first two questions are questions of fact, and the last two questions involve "both legal and factual inquiries regarding the left-behind parent's custody rights under the law of the State of the child's habitual residence and whether the parent was actually exercising those rights." *Id*. at 738. The burden is on the petitioner to establish by a preponderance of the evidence that the removal or retention was wrongful. 22 U.S.C. § 9003(e)(1). If the wrongful removal or retention is established (as determined by the answers to the four questions), then the burden shifts to the respondent to establish that a defense applies. *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) ("Upon a showing of wrongful removal, return of the child is required unless the respondent establishes one of four defenses."); *see also* 22 U.S.C. § 9003(e)(2) ("[A] respondent who opposes the return of the child has the burden of establishing … by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.").

## A. Wrongful Retention

To give the parties maximum guidance for the fast-approaching evidentiary hearing, and to narrow the scope of the hearing so that the parties can focus only what remains in the case, this Opinion will explain which specific elements of the claim and the defenses remain open for the evidentiary hearing. Based on the undisputed facts in the record, Petitioner has established, as a matter of law, two elements of his *prima facie* case for wrongful retention.[10] The first question is when

---

[10]Based on the briefs of the parties and the facts of this case, it is clear that this is a petition for wrongful *retention* of D.S. in the United States, not wrongful *removal*. Salazar

the retention occurred. *Redmond*, 724 F.3d at 737-38. Although Galvan disputes that her retention was wrongful at all, the parties agree that, *if* there indeed was a wrongful retention, it occurred on July 21, 2014. Pet.'s SOF ¶¶ 5-6; Resp.'s Resp. Pet.'s SOF ¶¶ 5-6. The Court will therefore use this date in evaluating the remaining elements of the prima facie case and defenses. *Redmond*, 724 F.3d at 737-38 (instructing courts to evaluate the child's habitual residence and custody rights at the time of removal or retention).

The undisputed evidence also shows that Salazar was exercising his custody rights at the time of the retention (again, the scope of the custody rights is an open legal issue, as explained later in this Opinion). Although the Hague Convention does not define "exercise," American courts have largely agreed on the standard to be used: "[t]he standard for finding that a parent was exercising his custody rights is a liberal one, and courts will generally find exercise whenever 'a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" *Walker v. Walker*, 701 F.3d 1110, 1121 (7th Cir. 2012) (quoting *Bader*, 484 F.3d at 671). Put another way, "a person cannot fail to 'exercise' his custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)) (internal alterations omitted). The court must evaluate whether the petitioner was exercising his custody rights *at the time of retention. Id.* at 1122 (noting that "failure to provide support *after* the retention is irrelevant to whether

---

concedes that he consented to D.S.'s move to the Chicago for the 2013-2014 school year. Pet.'s SOF ¶ 5.

[the petitioner] was exercising his custody rights when the wrongful retention began"). Once a court has concluded that "the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Bader*, 484 F.3d at 671 (quoting *Friedrich*, 78 F.3d at 1066).

Here, Salazar testified that he spoke regularly to D.S. over Skype and Facebook while the child was living with his mother in the United States. Salazar Dep. at 39:18-23, 42:17-43:1, 47:4-13, 52:10-17. Galvan did not contradict this testimony and agreed that D.S. communicated with his father throughout the school year. Galvan Dep. at 36:12-19, 45:2-10. D.S. also visited his father for more than a week in the year before the allegedly wrongful retention occurred. *Id.* at 35:16-36:5. This evidence is more than sufficient to show that, at the time of retention, Salazar was exercising his custody rights.[11] *Walker*, 701 F.3d at 1121 ("[C]ourts will generally find exercise whenever 'a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'"). The Court does not need to decide whether Salazar was exercising these rights well or badly, and there is certainly no evidence in the record that demonstrates "clear and unequivocal abandonment of the child." *Id.*; *Bader*, 484 F.3d at 671. Based on the undisputed evidence in the record, Salazar was exercising his custody rights before the retention in July 2014.

---

[11]There is still a dispute over whether Salazar had "rights of custody" as defined by the Hague Convention. But, assuming he did have such rights, it is clear that he was exercising them.

Moving on, to show that Galvan's retention of D.S. in the United States was "wrongful," Salazar must demonstrate that keeping D.S. in Chicago was "in breach of rights of custody attributed to" Salazar "under the law of the State in which the child was habitually resident immediately before the removal or retention." Hague Convention art. 3. To do so, Salazar must establish (1) where D.S.'s habitual residence was at the time of the retention and (2) that he had rights of custody under the laws of that State. *Redmond*, 724 F.3d at 737-38. Salazar argues that D.S.'s habitual residence was Mexico, and that Salazar had custody rights under the Mexican legal concept of *patria potestad*. Pet.'s Br. at 3-6. For the reasons discussed below, Salazar is not entitled to summary judgment on the habitual-residence element, because there is a genuine issue of material fact, and the Court will put-off, for now, deciding the custody-rights issue because a translation of the custody order is needed.

## 1. Habitual Residence

To determine if a removal or retention was wrongful, the Court must determine the "habitual residence" of the child immediately before the removal or retention. *Redmond*, 724 F.3d at 737-38. "The determination of 'habitual residence' is to be based on the everyday meaning of these words rather than on the legal meaning that a particular jurisdiction attaches to them." *Altamiranda Vale v. Avila*, 538 F.3d 581, 583 (7th Cir. 2008); *accord Kijowska v. Haines*, 463 F.3d 583, 585 (7th Cir. 2006) (noting that "otherwise forum shopping would come in by the back door"); *Koch*, 450 F.3d at 712. Habitual residence is a "question of fact to be decided by

reference to all the circumstances of any particular case." *Koch*, 450 F.3d at 712 (internal alterations and quotation marks omitted). "[C]ourts must consider the unique circumstances of each case when inquiring into a child's habitual residence." *Id.* at 716.

In evaluating "habitual residence" under the Hague Convention, the Seventh Circuit has adopted the approach developed by the Ninth Circuit in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). *See Redmond*, 724 F.3d at 745 ("We too have 'adopted a version of the analysis set out by the Ninth Circuit in *Mozes*.'"); *Koch*, 450 F.3d at 715. Under the *Mozes* approach, "the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise, one is not habitually residing; one is away for a temporary absence of long or short duration." *Mozes*, 239 F.3d at 1075 (noting that settled intention can "coalesce during the course of a stay abroad originally intended to be temporary"). The question, then, is whether the parents "shared an intent to abandon the prior habitual residence." *Koch*, 450 F.3d at 715; *Walker*, 701 F.3d at 1119 ("In a case alleging wrongful retention, we determine a child's habitual residence by asking whether a prior place of residence was effectively abandoned and a new residence established by the shared actions and intent of the parents coupled with the passage of time.") (internal alterations and quotation marks omitted). Recognizing that once a Hague Convention petition is filed, "the parents no longer share an intent on the child's habitual residence," the Seventh Circuit instructs that "the representations of the parties likely cannot be accepted at face value." *Koch*, 450

F.3d at 713. The Court must evaluate "the parents' actions as well as what they say." *Norinder*, 657 F.3d at 534. Ultimately, "the habitual-residence inquiry remains a flexible one, sensitive to the unique circumstances of the case and informed by common sense." *Redmond*, 724 F.3d at 744.

Even a temporary move can effectuate a change of a child's habitual residence. *Koch*, 450 F.3d at 715-16. To illustrate this principle, the Seventh Circuit describes three types of cases as separate points across a spectrum. On one end are "families which jointly take all the steps associated with abandoning habitual residence in one country to take it up in another." *Id.* at 713. In these cases, "courts would generally be unwilling to let one parent's reservations about the move stand in the way of finding a shared and settled purpose." *Id.* At the other end of the spectrum are the cases "where the child's initial move from an established residence was clearly intended to be of a specific, delimited period." *Id.* In cases like these, "courts have generally refused to allow the changed intentions of one parent to alter the habitual residence." *Id.* And somewhere in the middle lies the cases "where the petitioning parent earlier consented to let the child stay abroad for some period of ambiguous duration." *Id.* "In these cases, the circumstances surrounding the child's stay may sometimes suggest that, despite the lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the prior habitual residence." *Id.* And "[i]n other cases, the circumstances might suggest that there was no settled mutual intent to abandon the prior habitual residence." *Id.*

For example, the shared wish of a child's parents to return to the United States "someday" after moving to Germany was not sufficient to make the United States their child's habitual residence. *Koch*, 450 F.3d at 715-16 ("[H]abitual residence is not determined 'by wishful thinking alone.'"). The parents shared a settled intention to "move [to Germany] for an indeterminate period of time," therefore making Germany their (and thus their child's) habitual residence notwithstanding their hope to return to the United States when they met certain financial conditions. *Id.* Similarly, in *Whiting v. Krassner*, 391 F.3d 540 (3d Cir. 2004), the parents agreed that the child (an infant) would live with her mother in Canada after September 11, 2001. *Id.* at 542; *see also Koch*, 450 F.3d at 715-16 (discussing *Whiting*). They also agreed that she would return to the United States two years later so long as there was no imminent threat of terrorist attacks and the child's mother was allowed to work in the United States. *Whiting*, 391 F.3d at 542. After the father removed the infant to the United States, the mother filed a Hague petition. *Id.* at 543. In evaluating the petition, the court concluded that the child's habitual residence was in Canada. *Id.* at 549-50. Despite intentions to eventually return to the United States, the parents shared "an intent to abandon New York for a definite and extended period in the life of [the] infant." *Id.* at 550. "[T]he intent to abandon[ ] need not be forever." *Id.*

In evaluating habitual residence, then, the intent of the child's parents is critical. Salazar and Galvan disagree as to what their intent was when D.S. moved with Galvan to Chicago. Salazar and D.S. believe that D.S. alone would decide

whether he would return to Mexico when the school year was over. *See* Salazar Dep. at 35:14-36:7, 37:5-9; First In-Camera Hrg. Tr. at 5:9-7:21. Galvan, however, thought that the agreement was much more open-ended. She believed that, at the end of the year, Salazar, Galvan, and D.S. would all discuss what D.S.'s preference was and whether D.S. would stay in Chicago or not. *See* Galvan Dep. at 26:23-27:9. Because the determination of habitual residence is fact-intensive, and on summary-judgment review the evidence must be viewed in the non-movant's favor, the issue cannot be resolved as a matter of law on this record. The Court must evaluate the testimony of the parties to determine the nature of their agreement, their shared intent (if there was one) when D.S. moved to Chicago, and the circumstances surrounding the decision to move. *Koch*, 450 F.3d at 713-14 ("[T]he circumstances surrounding the child's stay may sometimes suggest that, despite the lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the prior habitual residence.").

The intent of the parents is not the only question. "[H]abitual residence is intended to be a description of a factual state of affairs, and a child *can* lose its habitual attachment to a place even without a parent's consent." *Koch*, 450 F.3d at 717 (quotation and citation omitted) (emphasis in original). Ultimately, the question is "whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment which its life has developed." *Id.* (interal quotation marks omitted). Of

course, "[a] parent cannot create a new habitual residence by the wrongful removal and sequestering of [the] child." *Kijowska*, 463 F.3d at 587 (internal alterations and quotation marks omitted). But where the parent's initial removal of the child was not wrongful, the Court can give weight to the duration of the child's residence in the United States. *Redmond*, 724 F.3d at 743; *Koch*, 450 F.3d at 717 ("[A]fter some period of time in the new environment, the habitual residence of the children will change regardless of the parents' hopes to someday return to the prior residence."). The parties agree that Galvan's initial removal of D.S. was not wrongful, as Salazar initially consented to D.S. staying in Chicago for one school year. Pet.'s SOF ¶ 5. So D.S.'s attachment to the United States developed in that first period of time (that is, the school year from 2013 to 2014) can be considered in determining his habitual residence at the time of the retention. *Redmond*, 724 F.3d at 743. D.S.'s level of attachment to the United States at that point is also a question of fact, and the parties should be prepared to present evidence on this issue at the evidentiary hearing.

To streamline the evidentiary hearing, it is important to clarify the narrow factual issues on which the parties should present evidence. The first issue is the intent of the parties at the moment in time when they agreed that D.S. would move to the United States with Galvan. This might include testimony from the parties[12] on what the agreement between the parties actually was and evidence of any actions that the parties took that might shed light on their intent. The second issue

---

[12] As previously agreed, D.S.'s in-camera testimony will be the stand-in for his trial testimony.

is whether D.S.'s stay in the United States before the allegedly wrongful retention effectively changed his habitual residence.

What is *not* at issue is D.S.'s actual preference in July 2014. The parties spend some time in their briefs discussing whether D.S. *actually* wanted to return to Mexico at the end of the school year or whether he was subject to Salazar's influence. Even if D.S.'s preference were relevant to the habitual-residence analysis, there is no genuine dispute of material fact on this issue. D.S. testified that, before the July 2014 meeting in Chicago, he told his father that he wanted to return to Mexico and told his mother that he wanted to stay in Chicago. First In Camera Hrg. Tr. at 10:24-14:1. This is consistent with his parents' testimony—Salazar believed that D.S. wanted to return to Mexico, and Galvan believed that he wanted to stay. Salazar Dep. at 39:8-23, 41:15-43:1, 46:21-47:23; Galvan Dep. at 49:6-50:1. D.S. also testified that he *actually* wanted to return to Mexico at that time, and that he was only telling his mother that he wanted to stay in the United States so that she would not stop Salazar from arranging to bring D.S. back to Mexico. First In Camera Hrg. Tr. at 10:24-16:8. Whether that decision was the product of Salazar's influence or not,[13] there is no dispute as to what D.S. actually wanted at the time. Because there is no genuine dispute on this fact, the parties should not present any evidence or testimony at the evidentiary hearing about D.S.'s actual preference at the July 2014 meeting.

---

[13]Galvan has cited no authority for her argument that "undue influence" before the initiation of proceedings under the Hague Convention will affect whether or not a retention was wrongful under the Convention. *See* Resp.'s Br. at 8-11.

## 2. Rights of Custody

A removal or retention is only "wrongful" under the Hague Convention if it is in violation of the "rights of custody" of the petitioning parent. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* (quoting Hague Convention art. 5(a)). These rights can "arise … by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of" the country of the child's habitual residence. Hague Convention art. 3; *see also Abbott*, 560 U.S. at 10; *Altamiranda*, 538 F.3d at 586. Rights of custody are separate from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention art. 5(b). If a removal or retention is in violation of the petitioner's rights of custody, "the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott*, 560 U.S. at 9 (quoting Hague Convention art. 4, 12). But—and this is important for this case— there is no return remedy under the Convention for a violation of a petitioner's rights of *access. Id.*; *see also Redmond*, 724 F.3d at 741.

Assuming that Salazar is correct that Mexico was D.S.'s habitual residence at the time of the retention, Mexican law would govern the content of Salazar's parental rights. *Altamiranda*, 538 F.3d at 583. Salazar argues that, as D.S.'s biological father, he has *patria potestad* (also called *patria potestas*) rights of

custody under Mexican law. R. 56, Pet.'s Br. at 4-5. *Patria potestas* is a concept from ancient Roman law that "denoted the father's absolute right (including the right of life and death) over his wife, children, and other subordinate family members." *Altamiranda*, 538 F.3d at 584. "Much modified, it survives as a legal doctrine in civil law countries." *Id.* Under Mexican civil law, *patria potestas* is "the joint exercise of parental authority" that encompasses "the comprehensive physical, mental, moral[,] and social protection of the minor child." *Whallon v. Lynn*, 230 F.3d 450, 456-57 (1st Cir. 2000); *Fernandez-Trejo v. Alvarez-Hernandez*, 2012 WL 6106418, at *2 (M.D. Fla. Dec. 10, 2012). Under the Civil Code of Nuevo Leon, *patria potestas* "is exerted jointly by both parents." Código Civil de Nuevo León (Civil Code of Nuevo Leon) art. 414 (attached as R. 30-2, Exh. F to Salazar's Amended Petition). "When the parents of a child born out of wedlock … separate, they will both retain parental authority/responsibility (*patria potestas*) but they will agree on which one is to have custody of the child." *Id.* art. 417. Even though *patria potestas* is distinct from physical custody, *see id.* art. 415 bis, 417; *Whallon*, 230 F.3d at 457, courts agree that a parent with *patria potestas* has "rights of custody" as defined by the Hague Convention, *see, e.g., Altamiranda*, 538 F.3d at 586-57 (Venezuelan law); *Whallon*, 230 F.3d at 458 (Mexican law); *see also Gatica v. Martinez*, 2010 WL 6744790, at *5-6 (S.D. Fla. Oct. 13, 2010) (citing cases).

But "*patria potestas* is a default doctrine and hence does not override rights conferred by a valid custody agreement between the parents." *Altamiranda*, 538 F.3d at 587 (citing *Gonzales v. Gutierrez*, 311 F.3d 942, 954 (9th Cir. 2002),

*abrogated on other grounds by Abbott*, 560 U.S. at 22); *Gonzales v. Preston*, 2015 WL 2402659, at *6 (M.D. Ala. May 20, 2015) ("In the case of parental separation, the civil code provides that *patria potestas* rights and obligations continue, though parents mutually may alter these terms by agreement."); *see also* Civil Code of Nuevo Leon art. 443-448. Salazar acknowledges that *patria potestas* rights can be terminated by a court order, *see* Pet.'s Br. at 5, and Galvan argues that the custody order between the parties did just that, *see* R. 66, Resp.'s Br. at 4-5. Indeed, some courts have found that a custody order or divorce decree extinguishes a parent's *patria potestas* rights (and also his custody rights). *See Gonzales*, 311 F.3d at 954 (holding that "the parties ha[d] executed a formal, legal custody agreement, thus eliminating any basis for relying on *patria potestas*"); *Ibarra v. Quintanilla*, 476 F. Supp. 2d 630, (S.D. Tex. 2007) (holding that, even though the divorce decree said that both parents would "continue executing their parental authority" over the child, the petitioning parent's *patria potestas* rights were extinguished by the divorce decree and he did not have rights of custody over the child). Other courts, however, have held that a custody order or divorce decree that expressly incorporates or preserves *patria potestas* rights affords parents the relevant rights of custody under the Convention. *See Altamiranda*, 538 F.3d at 587 (holding that a divorce decree that expressly preserved the right of *patria potestas* for both parents did not extinguish the father's rights of custody); *Gatica*, 2010 WL 6744790 at *5-6 (holding that a custody order that expressly incorporated and bestowed *patria potestas* rights on the petitioner could be invoked to create a right of custody);

*Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1123-24 (D. Colo. 2008) (holding that a divorce decree said that "both parties shall have the *paternal authority* of their minor children" preserved the petitioner's *patria potestas* rights and therefore his rights of custody).

At the very least, an English translation of the custody order is necessary to determine whether the custody order between Salazar and Galvan extinguished Salazar's rights of *patria potestas*. Moreover, even if the custody order does extinguish Salazar's *patria potestas* rights, it might nevertheless have retained for him *other* rights of custody that would be recognizable under the Hague Convention. *See Whallon*, 230 F.3d at 455 ("[T]he law of the child's habitual residence is invoked in the widest possible sense, and … the sources from which custody rights derive are all those upon which a claim can be based within the context of the legal system concerned.") (internal quotation marks omitted). So, pursuant to the Court's order of August 13, 2015, the parties must furnish the Court with a translation of the document by a court-certified interpreter.[14] Aug. 13, 2015 Minute Entry. Although this is likely a pure legal issue on which no fact-finding is required, the Court cannot resolve the question at this time. The decision on summary judgment for this

---

[14]As noted in the minute entry, neither party has yet submitted any evidence on the interpretation of Mexican law. *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."); Hague Convention art. 14 ("In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.")

specific issue is therefore reserved, and the Court will address Salazar's rights of custody after the evidentiary hearing along with the factual issue of D.S.'s habitual residence.

## B. Defenses

A court's determination that a child was wrongfully removed or retained does not automatically result in the return of the child to his or her habitual residence.[15] The Hague Convention "contains several defenses that may be asserted against a prima facie case for a return order." *Redmond*, 724 F.3d at 738 n.2; *see also* Hague Convention art. 13, 20. These exceptions must "be drawn very narrowly lest their application undermine the express purposes of the Convention." *Walker*, 701 F.3d at 1123 (citing 51 Fed. Reg. 10494, 10509 (March 29, 1986)). The parent objecting to the child's return bears the burden of proving the application of an exception by a preponderance of the evidence.[16] 22 U.S.C. § 9003(e)(2)(B). Even if an exception is proven, however, "the Article 13 exceptions are permissive: a court may order return even if it finds that the parent opposing the petition has established that one of the exceptions applies." *Walker*, 701 F.3d at 1123 (citing Hague Convention art. 13; 51 Fed. Reg. at 10509); *see also de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007) ("[E]ven if a defense is established, a court still has discretion to order the return of the child if it would further the aim of the Convention which is to provide

---

[15]For the purposes of evaluating the defenses to the Convention, the Court assumes that Salazar has proved that the retention was wrongful. To repeat, the point of addressing these issues now is to give the parties guidance on what the parameters of the bench trial will be.

[16]Two exceptions not relevant here—the grave-risk exception and fundamental-freedoms exception—must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

for the return of a wrongfully removed child."); *Karkkainen*, 445 F.3d at 288 ("[E]ven where a defense applies, the court has the discretion to order the child's return."); *Friedrich*, 78 F.3d at 1067 ("[A] federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention.").

In her response, Galvan raises two defenses against return under the Hague Convention: (1) Salazar consented or acquiesced to D.S.'s retention in the United States; and (2) D.S. objects to return to the United States and is of sufficient age and maturity for the Court to take account of his views.[17] Resp.'s Br. at 11-14. Galvan also raises several "equitable" defenses against Salazar. *Id.* at 14-15. The Court will address each of these defenses in turn.

## 1. Consent or Acquiescence

Even if a child has been wrongfully removed or retained from his habitual residence, a court need not order return of the child if the petitioning parent "consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a). Consent and acquiescence are separate defenses. *Walker*, 701 F.3d at 1122. "The consent exception applies when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention before it takes place." *Id.* "A parent's consent need not be formal, but it is important to consider

---

[17]In her Answer to Salazar's petition, Galvan also raises the well-settled child exception. R. 36, Answer at 17. The well-settled exception applies only when the petition under the Hague Convention is initiated more than a year after the allegedly wrongful removal or retention. Hague Convention art. 12. In this case, the allegedly wrongful retention occurred in July 2014. Pet.'s SOF ¶ 6. Salazar filed his petition on December 2, 2014. *See* Petition. The well-settled exception therefore does not apply.

what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.* (internal quotation marks omitted). Acquiescence, on the other hand, occurs when "a petitioning parent agrees to or accepts a removal or retention after the fact." *Id.* Acquiescence is more formal and might require evidence such as "testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Id.* at 1122-23 (quoting *Friedrich*, 78 F.3d at 1070). Like all exceptions under the Hague Convention, both consent and acquiescence must "be drawn very narrowly lest their application undermine the express purposes of the Convention." *Id.* at 1123.

There is no record evidence that Salazar acquiesced to D.S. remaining the United States after the retention in July 2014, and Respondent does not argue that there was any acquiescence. *See* Resp.'s Br. at 11-13 (discussing only consent). When viewing the evidence in Galvan's favor, consent is a closer question. As discussed above, there is a genuine (if narrow) dispute of fact as to what the agreement between Salazar and Galvan actually was. As explained above, the factual details of the agreement and evidence of Salazar's subjective intent are necessary to determine whether he gave consent to D.S.'s continued stay in Chicago. *See Baxter v. Baxter*, 423 F.3d 363, 371-72 (3d Cir. 2005) ("The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account. The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to

removal or retention under the Convention."). Summary judgment is therefore denied as to this defense, and the parties must be prepared to present evidence on the nature of their agreement and Salazar's intent, as of July 2013.

## 2. Mature Child

Under the Hague Convention, the Court can "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13; *see also Abbott*, 560 U.S. at 22 (recognizing the mature-child exception). The respondent bears the burden to establish that this defense applies by a preponderance of the evidence. *Bader*, 484 F.3d at 668. And, as with all exceptions to return under the Hague Convention, the mature-child defense must "be drawn very narrowly." *Walker*, 701 F.3d at 1123. Although the objection of a mature child can form the basis of a court's decision not to return a child, "[a] court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis." *de Silva*, 481 F.3d at 1286. Even if the Court determines that the exception applies, it can nonetheless order return of the child if return would further the aims of the Convention. *Id.*; *see also* 51 Fed. Reg. at 10509 ("As with the other Article 13 exceptions to the return obligation, the application of [the mature-child] exception is not mandatory.").

There is no set age at which a child has reached "an age and degree of maturity at which it is appropriate to take account of [his] views." *See Simcox v.*

*Simcox*, 511 F.3d 594, 603-04 (6th Cir. 2007). "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *de Silva*, 481 F.3d at 1287. Here, there is no question that D.S. is sufficiently mature to invoke the exception. D.S. is a bright, compassionate, and confident twelve-year old, who has demonstrated a keen understanding of the dispute between his parents. In both of the Court's conversations with D.S., he answered questions thoughtfully and showed levels of empathy and diplomacy beyond those of an ordinary twelve-year-old. *See Vasconcelos v.* Batista, 512 F. App'x 403, 405 (5th Cir. 2013) (holding that the determination that a thirteen-year-old is mature is consonant with other cases). Neither side (including Salazar) offers evidence that calls into question D.S.'s maturity, so no further evidentiary hearing is needed to conclude that D.S. is mature enough to trigger the possible application of this defense.

There is also no doubt that D.S. objected to returning to Mexico in the second in-camera hearing.[18] Although at the first in-camera hearing, D.S. said he preferred

---

[18]In her supplemental brief on the mature-child issue, R. 70, Resp.'s Suppl. Br., Galvan argues that the mature-child exception only requires that the child *prefers* not to return to his habitual residence; it does not require an objection. *Id.* at 3-4. Although some cases have used language like "preference" or "views" in evaluating a mature-child exception, the text of the Convention makes clear that the exception applies when "the child *objects* to being returned." Hague Convention art. 13 (emphasis added). And though the Seventh Circuit has not directly addressed whether a preference is sufficient to invoke an exception, at least one other appellate court has held that a true objection is necessary. *See Yang v. Tsui*, 499 F.3d 259, 279 (3d Cir. 2007); *see also Vilen-Burch v. Burch*, 2013 WL 1909472, at *9 (S.D. Ind. May 8, 2013) (denying to apply the mature-child exception in part because the child only expressed "a generalized desire to remain in the United States"); *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 206-07 (E.D.N.Y. 2010) (noting that "courts distinguish between a child's 'objection' to return, as reference in the Hague Convention, 'and a child's wishes, as expressed in a custody case'"). But even if no objection is necessary,

to stay in the United States, by the second hearing, his preference had hardened into a true objection. When the Court asked if D.S. "object[ed] to going back to Mexico," D.S. answered that he was "[s]tarting to, yes. Yes I would object to going back." Second In Camera Hrg. Tr. at 12:21-25. He acknowledged that there were "some days" where he would not object to returning, and that "[e]ven [his] mom says that sometimes she wishes she could go back," but despite his occasional feelings of nostalgia or homesickness, D.S. clearly stated that he now objects to being returned. *Id.* at 13:1-14:17.

But even if a child objects to returning, and even if the child is of an age and degree of maturity at which it is appropriate to consider his views, the "child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." 51 Fed. Reg. at 10509; *see also Walker*, 701 F.3d at 1123 ("In conducting this inquiry, we caution that the district court must be attentive to the possibility that the children's views may be the product of 'undue influence' of the parent who currently has custody."). In D.S.'s conversations with his guardian *ad litem* and with the Court, D.S. did say that his mother spoke with him about the benefits of remaining in Chicago and the problems with returning to Mexico. *See* Guardian Report at 3 (reporting that D.S. said "his mom made a good point about it could benefit him when he grows up if he were to stay here," that "his mom said that he made progress with his English since he left Mexico," and that his mom

---

the in-camera testimony of D.S. demonstrates that the child did express an objection to return rather than a mere preference to remain.

sometimes tells him about the violence in Mexico); First In-Camera Hrg. Tr. at 21:22-22:24, 23:12-21 (saying that "my mom had talked with me and she showed me all the progress I had, and the benefits of being here, and also she showed me that … she didn't know people living in [Monterrey] that were as successful as people living here"). There is also evidence that Galvan told D.S. that, if she loses this case, she will have to pay Salazar's fees and costs, and that she cannot afford to pay. *See* Guardian Report at 3; First In Camera Hrg. Tr. at 23:3-11 ("Q. And what did she say about having to pay for your dad's lawyer? A. She told me that she—since we didn't have that much money to even maintain ourself, or do—go out every day, that she wouldn't have money to pay the lawyer."). For her part, Galvan argues that it was *Salazar* who influenced D.S. *See* Resp.'s Suppl. Br. at 14-15 (citing to evidence that Salazar told D.S. that, even though he had now expressed a preference, the case was out of Salazar's control and Salazar's pressure on the child to return).

The Court need not conduct an evidentiary hearing on the issue of undue influence, however, because even if there were not undue influence, the Court would decline to apply the exception. "As with the other Article 13 exceptions to the return obligation, the application of [the mature child] exception is not mandatory." 51 Fed. Reg. at 10509. A court can, in its discretion, decline to apply the exception where it would not further the aims of the Convention. *See de Silva*, 481 F.3d at 1286. Here, D.S.'s objection to return is premised almost entirely on his concern about his or his mother's ability to travel to and from Mexico. Second In Camera Hrg. Tr. at 16:7-17:5. Although D.S. described other reasons for wanting to stay in

Chicago—better schools, safer neighborhoods, seeing his baby sister—his objection dissolved if the impediment to travel was lifted. *Id.* ("Q. [A]ssuming [Galvan] could travel back and forth as of February of next year, would that change your mind about objecting to being ordered to return to Mexico to live there? … A. Yeah, it would probably change my mind about going back."). If D.S.'s mother could "visit freely," D.S. would no longer *object* to returning to Mexico. *Id.* at 16:22-17:5. The crucial point on this issue is this: if Galvan wrongfully retained D.S. in the United States, then the travel restriction that is the basis for D.S.'s objection was created by that wrongful retention and Galvan's own conduct in violating the immigration law of the United States.[19] To allow Galvan's wrongful retention and her unstable immigration status to create the circumstances that led to D.S.'s objection would essentially "reward [Galvan] for violating [Salazar's] custody rights, and defeat the purposes of the Convention." *Yang*, 499 F.3d at 280 (agreeing with the district court's decision to decline to apply the exception where a parent's wrongful retention of the child created the attachment to the child's new environment that was the basis of her objection to return). And Galvan might be able to take steps to solve the travel restriction, because she is married to a United States citizen; as discussed during the August 5, 2015 status hearing, R. 60, if she were to apply for permanent resident status based on the marriage, then she likely would receive that status in around six months, and would be able to travel between the two countries. It is true that Galvan faces a financial obstacle to file the application, but that does not tip the scale in her favor (if she is found to have wrongfully retained

_____

[19]Galvan and D.S. overstayed tourist visas.

D.S.). On top of all this, D.S.'s objection is also premised in part on, as time has passed, the fact that he is getting "used" to missing his father and the extended family in Mexico, and returning to Mexico would mean that D.S. would have to then get used to missing his mother and sister here. Second In Camera Hrg. Tr. at 8:7-12, 20:7-18. Assuming that the retention was wrongful, this premise for the objection too should not be given weight, lest the wrongful conduct be rewarded. The Court holds, therefore, that even if Galvan could demonstrate that the elements of the mature-child defense had been proven, discretion is best exercised by *not* applying the exception in this case.

It is not at all easy for the Court to reject D.S.'s wishes: he is a mature and compassionate child, and his voice does and should matter. He did not choose to be put in this situation. For him (and really for both parties), there is no "winning" this case. But this Court must follow the law and must take into account the *systemic* interests at stake, not just the individual interests, no matter how intensely felt. Those systemic interests do end-up serving the interests of individuals in the long run, though that is little comfort to D.S. in this case. Summary judgment is granted for Salazar against the mature-child defense: it shall not apply.

### 3. Equitable Defenses

In her answer to Salazar's petition, Galvan asserted several "equitable defenses," such as waiver, estoppel, laches, ratification, and unclean hands. Answer at 16. Salazar argues that these equitable defenses are not available under the Hague Convention. Pet.'s Br. at 14-15. The Court agrees.

To be sure, in interpreting federal *statutes* enacted by Congress, courts generally assume that "all the inherent equitable powers of the District Court are available for the proper and complete exercise of its equitable jurisdiction." *Town of Munster v. Sherwin-Williams Co.*, 27 F.3d 1268, 1271 (7th Cir. 1994) (internal alterations, quotation marks, and citations omitted). But "[t]he Hague Convention, of course, is a treaty, not a federal statute." *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232-34 (2014). As such, the Convention was not drafted in light of the "established backdrop of American law." *Id.* It is therefore inappropriate to presume that the Hague Convention incorporates the equitable defenses of American law. *Id.*

The text of the Convention also suggests that such defenses are not available. For one, the language of the Convention is focused on returning a wrongfully removed or retained child to the habitual residence so that that State can decide the custody dispute. *See Karpenko v. Leendertz*, 619 F.3d 259, 265 (3d Cir. 2010). It is not a determination of the *merits* of the custody dispute, and "[t]he conduct of the parents, other than the claim of abduction or retention, is not mentioned in the Hague Convention except to the extent that [the] conduct may be relevant to one of the affirmative defenses." *Id.* To allow the conduct of the parents to affect the resolution of a petition for return would come dangerously close to deciding the underlying merits of the custody dispute and stray from the Hague Convention's purpose of promptly restoring the status quo. *Id.* Moreover, the Convention sets forth several specific and narrow defenses to the remedy of return. *See* Hague Convention art. 13, 20. The equitable defenses offered by Galvan are "simply not

[included in] the narrow defenses set forth in the Hague Convention." *McCurdy v. Shreve-McCurdy*, 806 F. Supp. 2d 1010, 1021 (E.D. Mich. 2011); *see also In re Application of Stead v. Meduno*, 2014 WL 7403282, at *4 (D. Colo. Dec. 29, 2014) ("The equitable doctrines invoked by respondent are not mentioned in the Convention and are therefore not properly brought as defenses to a petition for return of the child."); *Uzoh v. Uzoh*, 2012 WL 1565345, at *6 (N.D. Ill. May 2, 2012) ("The Hague Convention does not recognize unclean hands as a defense."). There is therefore no basis on which to conclude that the drafters of the Convention intended to include these background equitable defenses in the Hague Convention. Because these equitable defenses are not available under the Hague Convention, Salazar is entitled to summary judgment on Galvan's defenses of waiver, estoppel, laches, ratification, and unclean hands.

## IV. Conclusion

For the reasons discussed above, Salazar's motion for summary judgment is granted in part, denied in part, and reserved in part. Salazar is entitled to summary judgment on two elements of his *prima facie* case: (1) to the extent that there was a wrongful retention, it occurred on July 21, 2014 and (2) to the extent that he had rights of custody, he was exercising those rights at the time of removal. Salazar is also entitled to summary judgment against the mature-child defense and the equitable defenses asserted by Respondent.

Summary judgment is denied as to D.S.'s habitual residence. When viewing the facts in Galvan's favor, there is a genuine dispute of material fact on the intent

of the parties and D.S.'s acclimatization to the United States (as relevant only to the element of habitual residence). Summary judgment is also denied as to the consent defense because there is a factual dispute as to the scope of the agreement between the parties and Salazar's subjective intent. The parties will present evidence on these issues at the evidentiary hearing on August 21, 2015. Finally, the Court reserves decision on the "rights of custody" element. This question of law will be resolved, along with the remaining factual issues, in an opinion issued after the evidentiary hearing.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: August 16, 2015