| | | |
|---|---|---|
| RAUL SALAZAR GARCIA, | ) | |
| | ) | |
| Petitioner, | ) | No. 14 C 09644 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| EMELY GALVAN PINELO, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Raul Salazar Garcia, a resident of Mexico, filed this petition against Respondent Emely Galvan Pinelo, a resident of Chicago, for return of the parties' minor son, D.S., to Mexico. The petition is brought under the Hague Convention on Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, and its implementing legislation, the International Child Abduction Remedies Act (ICARA), 22 U.S.C. § 9001 *et seq.*[1] R. 30, Am. Petition. Several issues were resolved on summary judgment, *see* R. 72, Order Mot. Summ. J., and an evidentiary hearing (essentially, a bench trial on specific issues) was held to address the remaining factual issues. Based on the evidentiary record, the Court concludes that Galvan's retention of D.S. in the United States in July 2014 was wrongful, and that no defenses to the return remedy apply. Salazar's petition for return is granted.

---

[1]The statute was previously codified at 42 U.S.C. § 11601 *et seq.* The Court has subject-matter jurisdiction over this ICARA case under 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331. Citations to the docket are "R." followed by the entry number and, when necessary, the page or paragraph number.

## I. Findings of Fact

Many of the facts surrounding D.S.'s retention in the United States are not genuinely in dispute. Those facts are set forth in the opinion on Salazar's motion for summary judgment, *see* Order Mot. Summ J. at 2-7, and the Court assumes familiarity with those facts. The evidentiary hearing was held to resolve three specific factual issues: (1) the scope of the parties' agreement on D.S.'s move to the United States; (2) the parties' intent in forming that agreement; and (3) the level of D.S.'s acclimatization to the United States in the year before the allegedly wrongful retention.

In July 2013, Salazar, Galvan, and D.S. met in a Monterrey, Mexico Starbucks to discuss Galvan and D.S. moving to Chicago. Galvan explained to D.S. and Salazar that she thought there would be more educational opportunities for D.S. in Chicago than Monterrey. D.S. was understandably concerned about leaving his life in Mexico behind, and Salazar did not want to lose time with his son. After a couple of hours of discussion, the parties came to an agreement, the scope of which they now dispute. On one side, Salazar and D.S. both testified that, after one school year, D.S. would get to decide whether he wanted to remain in Chicago or return to Monterrey. R. 52, First In-Camera Hrg. Tr. at 6:21-7:10.[2] In contrast, Galvan testified that she and Salazar agreed that they would reevaluate after the school year was over and decide the next steps, taking D.S.'s opinion into account.

---

[2]The Court held an in-camera hearing with the child. The parties agreed that the in-camera hearing would stand in for D.S.'s trial testimony.

The Court credits the version of events described by Salazar and D.S.—that the parties agreed to allow D.S. to decide where to live at the end of the school year. Based on their testimony at the evidentiary hearing, it is apparent that both parents thought that D.S. would choose to live with them at the end of the year. Although Salazar understood that D.S.'s move to the United States could possibly be permanent, he strongly believed that D.S. would return to Mexico at the end of the year. He therefore did not intend that D.S. would permanently give up his home in Mexico, just that the child would spend a year there and then decide whether to return. And though Galvan might have actually believed that D.S. would stay in Chicago after a year, in view of D.S.'s and Salazar's credible testimony, the Court concludes that she said to Salazar and D.S. that D.S. would be the one to decide.[3]

Soon after this meeting, D.S. and Galvan moved to Chicago. For D.S., the year had its ups and downs. He spoke little English when he arrived, but his language skills quickly improved. His grades also improved significantly over the course of his first year; he went from below average for his grade-level to above average in both math and reading in a single school term. D.S. developed a social life in Chicago: he made friends; he started a relationship with a girlfriend; and he joined various clubs and sports teams. D.S. also developed a relationship with his new step-father, step-sister, and baby half-sister, and he and his mother started to cultivate relationships with her extended family that lived in the area.

---

[3]The Court is certainly not finding that Galvan's testimony was intentionally untrue; rather, it is possible that after the passage of time, and given the length (a couple of hours) and nature (back-and-forth discussion and negotiation) of that meeting, she genuinely believes in her version of the agreement.

Although D.S. adapted to life in Chicago, he also had low moments. He missed his family and friends in Mexico. First In-Camera Hrg. Tr. at 12:12-24. He missed his school in Mexico. *Id.* He missed his dog. *See* R. 65-11, D.S. Pros and Cons List. He also struggled with the disagreements between Galvan and her new mother-in-law, who was living with them. First In-Camera Hrg. Tr. at 11:23-12:11. Overall, D.S. was angry with his mom for bringing him to Chicago, *id.* at 11:16-22, and by the end of the school year, he wanted to go back to Monterrey, which he saw as his home, *id.* at 11:3-13:20. D.S. told his father about the difficult parts of his year and said that he wanted to return to Mexico. *Id.* Believing that, based on the agreement with Galvan, D.S.'s wishes would determine where he would live after the school year, Salazar bought D.S. a plane ticket to Monterrey.

## II. Legal Standard

"The central question in any petition seeking the return of a child under the Hague Convention and ICARA is whether the child who is the subject of the petition has been 'wrongfully' removed or retained within the meaning of the Convention." *Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013). Under the Convention, a removal or retention is wrongful where (a) "it is in breach of rights of custody attributed to a person, an institution[,] or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention"; and (b) "at the time of removal or retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention art. 3.

4

Interpreting this language, courts have established a series of four questions to determine if a removal or retention was wrongful: "(1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?" *Redmond*, 724 F.3d at 737-38 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006); *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001)). The first two questions are questions of fact, and the last two questions involve "both legal and factual inquiries regarding the left-behind parent's custody rights under the law of the State of the child's habitual residence and whether the parent was actually exercising those rights." *Id.* at 738. The burden is on the petitioner to establish by a preponderance of the evidence that the removal or retention was wrongful. 22 U.S.C. § 9003(e)(1). If the wrongful removal or retention is established (as determined by the answers to the four questions), then the burden shifts to the respondent to establish that a defense applies. *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) ("Upon a showing of wrongful removal, return of the child is required unless the respondent establishes one of four defenses."); *see also* 22 U.S.C. § 9003(e)(2) ("[A] respondent who opposes the return of the child has the burden of establishing … by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.").

### III. Analysis

The purpose of the Hague Convention is "to secure the prompt return of children wrongfully removed or retained in another signatory State."[4] *Redmond*, 724 F.3d at 739 (quoting Hague Convention art. 1) (internal quotation marks omitted). "To this end, the Convention employs a remedy of return, which entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of habitual residence." *Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015) (internal quotation marks and citations omitted). "A court's role in enforcing the Convention is not to settle a custody dispute between the parties, but rather to restore the status quo prior to any wrongful removal or retention." *Id.* (internal quotation marks omitted). "The court's task is to simply determine which country is the proper forum for that custody determination." *Koch v. Koch*, 450 F.3d 703, 711 (7th Cir. 2006).[5]

### A. Wrongful Retention

As discussed in the order on summary judgment, the only remaining issues in the wrongful-retention analysis are: (1) D.S.'s habitual residence in July 2014; and (2) whether Salazar has rights of custody under the law of D.S.'s habitual residence. *See* Order Mot. Summ. J. at 8-10. For the reasons discussed below, the Court

---

[4]Both the United States and Mexico are signatories of the Hague Convention. *See* http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html (last visited August 28, 2015).

[5]The Court emphasizes that this is not a determination of the best interests of D.S.; that is not the Court's role. A Mexican court might very well decide that D.S. should continue to live with his mother in Chicago. Under the Hague Convention, however, this Court is not deciding the best interests of the child, and is only deciding which country's courts should resolve that issue.

concludes that D.S's habitual residence was Mexico, and that, under the law of Mexico, Salazar had rights of custody. Salazar has shown, therefore, that Galvan wrongfully retained D.S. in the United States in violation of the Hague Convention.

## 1. Habitual Residence

To determine if a removal or retention was wrongful, the Court must determine the "habitual residence" of the child immediately before the removal or retention. *Redmond*, 724 F.3d at 737-38. "The determination of 'habitual residence' is to be based on the everyday meaning of these words rather than on the legal meaning that a particular jurisdiction attaches to them." *Altamiranda Vale v. Avila*, 538 F.3d 581, 583 (7th Cir. 2008); *accord Kijowska v. Haines*, 463 F.3d 583, 585 (7th Cir. 2006) (noting that "otherwise forum shopping would come in by the back door"); *Koch*, 450 F.3d at 712. Habitual residence is a "question of fact to be decided by reference to all the circumstances of any particular case." *Koch*, 450 F.3d at 712 (internal alterations and quotation marks omitted). "[C]ourts must consider the unique circumstances of each case when inquiring into a child's habitual residence." *Id.* at 716.

In evaluating "habitual residence" under the Hague Convention, the Seventh Circuit has adopted the approach developed by the Ninth Circuit in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). *See Redmond*, 724 F.3d at 745 ("We too have 'adopted a version of the analysis set out by the Ninth Circuit in *Mozes*.'"); *Koch*, 450 F.3d at 715. Under the *Mozes* approach, "the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind. Otherwise,

one is not habitually residing; one is away for a temporary absence of long or short duration." *Mozes*, 239 F.3d at 1075 (noting that settled intention can "coalesce during the course of a stay abroad originally intended to be temporary"). The question, then, is whether the parents "shared an intent to abandon the prior habitual residence." *Koch*, 450 F.3d at 715; *Walker v. Walker*, 701 F.3d 1110, 1119 (7th Cir. 2012). In cases "where the petitioning parent earlier consented to let the child stay abroad for some period of ambiguous duration, … the circumstances surrounding the child's stay may sometimes suggest that, despite the lack of perfect consensus, the parents intended the stay to be indefinite, leading to an abandonment of the prior habitual residence." *Koch*, 450 F.3d at 713-14. And "[i]n other cases, the circumstances might suggest that there was no settled mutual intent to abandon the prior habitual residence." *Id.*

Here, the parties agreed that D.S. would live in Chicago for the school year, and that the child alone would be allowed to decide where he wanted to live at the end of that time. Under that agreement, the duration of D.S.'s stay in the United States was not set in stone. He could have stayed in the United States indefinitely, or he could have returned to Mexico after a year. It was up to D.S. to decide. Though the precise duration of D.S.'s stay in the United States was not clear, the testimony of the parties demonstrates that there was no settled mutual intent that D.S. should abandon his prior habitual residence in Monterrey. *See Mozes*, 239 F.3d at 1081 ("Where … children already have a well-established habitual residence, simple consent to their presence in another forum is not usually enough to shift it there.").

Even if Galvan did not believe that D.S. would *actually* choose to return to Mexico, both parties contemplated the possibility that D.S.'s stay in the United States would be temporary. Salazar certainly believed that D.S. would return when the school year was over, and his belief was reinforced throughout the year as D.S. told Salazar that he (D.S.) was unhappy in Chicago and wanted to return to Monterrey. First In-Camera Hrg. Tr. at 10:24-11:15. Salazar believed so strongly that D.S. would return that he bought D.S. a plane ticket back to Mexico. Despite Galvan's own settled intent to abandon Monterrey and her hope that D.S. would come to understand the educational opportunities in the United States, the parents did not share a mutual intent that D.S. abandon Mexico as his habitual residence.

That does not necessarily end the analysis. Even if there was no mutual parental consent to abandon the prior habitual residence, a child's habitual residence can change if he becomes sufficiently acclimatized to the United States. *See Mozes*, 239 F.3d at 1078-79. "[H]abitual residence is intended to be a description of a factual state of affairs, and a child *can* lose its habitual attachment to a place even without a parent's consent." *Koch*, 450 F.3d at 717 (quotation and citation omitted) (emphasis in original). Ultimately, the question is "whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment which its life has developed." *Id.* (internal quotation marks omitted). Of course, "[a] parent cannot create a new habitual residence by the wrongful removal and sequestering of

[the] child." *Kijowska*, 463 F.3d at 587 (internal alterations and quotation marks omitted). But where the parent's initial removal of the child was not wrongful, the Court can give weight to the duration of the child's residence in the United States. *Redmond*, 724 F.3d at 743; *Koch*, 450 F.3d at 717 ("[A]fter some period of time in the new environment, the habitual residence of the children will change regardless of the parents' hopes to someday return to the prior residence."). Because Galvan's initial removal of D.S. was not wrongful, whatever attachment to the United States D.S. developed in that first period of time (that is, the school year from 2013 to 2014) can be considered in determining his habitual residence at the time of the retention. *Redmond*, 724 F.3d at 743. But "in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." *Mozes*, 239 F.3d at 1079.

It is true that D.S. adapted to life in the United States. He improved in school, made friends, built family relationships, and joined clubs. But "[c]hildren can be remarkably adaptable and form intense attachments even in short periods of time[;] … this does not mean that the child expects or intends those relationships to be long-lived." *Id*. Just because a child is "well-adjusted" does not necessarily mean that the new location has become the child's habitual residence. *Id*. And there is no question that, no matter how well-adjusted D.S. was, he did not regard Chicago as his permanent home.[6] He missed his family, friends, and school in Monterrey, and

---

[6]Galvan argues that, based on the reasoning of *Mozes*, the intent of the child is irrelevant to the acclimatization inquiry. Though that may be true in assessing whether there was settled intent to abandon the prior habitual residence, the actual

critically, at the end of the school year, he wanted to return. First In-Camera Hrg. Tr. at 11:3-14:1. Despite D.S.'s adjustment to his circumstances, the Court cannot "say with confidence that the child's relative attachments to the two countries ha[d] changed to the point where requiring return to [Mexico] would now be tantamount to taking the child out of the family and social environment which [his] life has developed." *Koch*, 450 F.3d at 717 (internal quotation marks omitted). D.S. had not, therefore, acclimatized to the United States such that it had become his new habitual residence. Because there was no mutual parental intent to abandon Mexico as D.S.'s habitual residence, and because the child had not acclimatized to the United States, D.S.'s habitual residence was Mexico at the time of the retention.

### 2. Rights of Custody

A removal or retention is only "wrongful" under the Hague Convention if it is in violation of the "rights of custody" of the petitioning parent. *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* (quoting Hague Convention art. 5(a)). These rights can "arise … by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of" the country of the child's habitual residence. Hague Convention art. 3; *see*

---

circumstances of the child's life, including his perspectives on his habitual residence, are critical for the question of acclimatization. *Mozes*, 239 F.3d at 1078-80 (discussing the intent, expectations, and knowledge of the child in relation to the acclimatization inquiry); *see also Redmond*, 724 F.3d at 746 (describing the child's acclimatization as a question of "the child's perspectives").

*also Abbott*, 560 U.S. at 10; *Altamiranda*, 538 F.3d at 586. Rights of custody are separate from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Hague Convention art. 5(b). If a removal or retention is in violation of the petitioner's rights of custody, "the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott*, 560 U.S. at 9 (quoting Hague Convention art. 4, 12). But—and this is important for this case— there is no return remedy under the Convention for a violation of a petitioner's rights of *access. Id.*; *see also Redmond*, 724 F.3d at 741.

Because D.S.'s habitual residence was Mexico in July 2014, Mexican law determines whether Salazar had rights of custody at that time. *Altamiranda*, 538 F.3d at 583. Salazar argues that, as D.S.'s biological father, he has *patria potestad* (also called *patria potestas*) rights of custody under Mexican law. R. 56, Pet.'s Br. at 4-5. *Patria potestas* is a concept from ancient Roman law that "denoted the father's absolute right (including the right of life and death) over his wife, children, and other subordinate family members." *Altamiranda*, 538 F.3d at 584. "Much modified, it survives as a legal doctrine in civil law countries." *Id.* Under Mexican civil law, *patria potestas* is "the joint exercise of parental authority" that encompasses "the comprehensive physical, mental, moral[,] and social protection of the minor child." *Whallon v. Lynn*, 230 F.3d 450, 456-57 (1st Cir. 2000); *Fernandez-Trejo v. Alvarez-Hernandez*, 2012 WL 6106418, at *2 (M.D. Fla. Dec. 10, 2012).

Under the Civil Code of Nuevo Leon, *patria potestas* "is exerted jointly by both parents." Código Civil de Nuevo León (Civil Code of Nuevo Leon) art. 414 (attached as R. 30-2, Exh. F to Salazar's Amended Petition). According to the Code, "[w]hen the parents of a child born out of wedlock ... separate, they will both retain parental authority/responsibility (*patria potestas*) but they will agree on which one is to have custody of the child." *Id.* art. 417; *see also id.* art. 283 ("In a divorce decree, the judge will determine which rights and obligations derived from paternal authority/responsibility (*patria potestas*) and custody will be retained by each of the parents."). So, though *patria potestas* involves the right to decide where a child lives, it is distinct from the right to physical custody, as implied by the textual distinction between the two in the Code and as held by the First Circuit. *See id.* art. 415 bis ("Even if they do not have custody of the minors, those exerting parental authority/responsibility (*patria potestas*), have a right to coexist (spend time) with their descendants."); *see also id.* art. 417 (distinguishing physical custody and *patria potestas*); *Whallon*, 230 F.3d at 457 (describing physical custody and *patria potestas* as "divisible custody rights"). Courts agree that a parent with *patria potestas* has "rights of custody" as defined by the Hague Convention. *See, e.g., Altamiranda*, 538 F.3d at 586-57 (Venezuelan law); *Whallon*, 230 F.3d at 458 (Mexican law); *see also Gatica v. Martinez*, 2010 WL 6744790, at *5-6 (S.D. Fla. Oct. 13, 2010) (citing cases).

But "*patria potestas* is a default doctrine and hence does not override rights conferred by a valid custody agreement between the parents."[7] *Altamiranda*, 538 F.3d at 587 (citing *Gonzalez v. Gutierrez*, 311 F.3d 942, 954 (9th Cir. 2002), *abrogated on other grounds by Abbott*, 560 U.S. at 22); *Gonzales v. Preston*, 2015 WL 2402659, at *6 (M.D. Ala. May 20, 2015) ("In the case of parental separation, the civil code provides that *patria potestas* rights and obligations continue, though parents mutually may alter these terms by agreement."); *see also* Civil Code of Nuevo Leon art. 283, 443-448. Salazar acknowledges that *patria potestas* rights can be terminated by a court order, *see* Pet.'s Br. at 5, and Galvan argues that the custody order between the parties did just that, *see* R. 66, Resp.'s Br. at 4-5. Indeed, some courts have found that a custody order or divorce decree extinguishes a parent's *patria potestas* rights (and also his custody rights). *See Gonzalez*, 311 F.3d at 954 (holding that "the parties ha[d] executed a formal, legal custody agreement, thus eliminating any basis for relying on *patria potestas*"); *Ibarra v. Quintanilla*, 476 F. Supp. 2d 630, (S.D. Tex. 2007) (holding that, even though the divorce decree said that both parents would "continue executing their parental authority" over the child, the petitioning parent's *patria potestas* rights were extinguished by the divorce decree and he did not have rights of custody over the child). Other courts, however, have held that a custody order or divorce decree that expressly incorporates or preserves *patria potestas* rights affords parents the relevant rights of custody under the Convention. *See Altamiranda*, 538 F.3d at 587 (holding that a

_____

[7]Note, however, that the rights of *patria potestas* are not waivable. Civil Code of Nuevo Leon art. 448.

divorce decree that expressly preserved the right of *patria potestas* for both parents did not extinguish the father's rights of custody); *Gatica*, 2010 WL 6744790 at *5-6 (holding that a custody order that expressly incorporated and bestowed *patria potestas* rights on the petitioner could be invoked to create a right of custody); *Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1123-24 (D. Colo. 2008) (holding that a divorce decree said that "both parties shall have the *paternal authority* of their minor children" preserved the petitioner's *patria potestas* rights and therefore his rights of custody).

It is true, then, that *patria potestas* rights can be overridden. The question is whether the parties' paternity and custody agreement, which the Mexican court adopted and entered as an order, extinguished those rights. The order does not expressly mention *patria potestas*. The order does resolve four key issues surrounding D.S. First, Galvan legally acknowledged Salazar's paternity. R. 73, Custody Order at 3. Second, the order awarded physical custody to Galvan. *Id.* at 4 ("[The parents] agreed that the custody of their minor child [D.S.] should be with Mrs. Emely Galvan Pinelo."). Third, the order granted visitation rights to Salazar on Wednesdays and Sundays. *Id.* And finally, it established the amount of child support that Salazar was required to pay. *Id.* Galvan argues that, by setting out Salazar's visitation rights, the Mexican court was implicitly limiting him to only those rights, thereby extinguishing any rights of *patria potestas* and leaving him only with rights of access under the Hague Convention.

This is a close call, but ultimately the Court concludes that Salazar retained his rights of custody under the Convention. This conclusion is explained below, but it is worth noting two things before discussing the merits of the issue. First, neither party provided much information on Mexican law, and the Court's own research—which was limited by the short time frame between the summary-judgment briefing, where this issue first came to the Court's attention, and the evidentiary hearing, which was scheduled to allow for the resolution of the case before the child's next school year began—turned up little. Apart from the Code of Nuevo Leon, which does not provide a clear answer, the parties did not cite to any Mexican authority. Salazar did belatedly submit a letter under Article 15 of the Hague Convention, *see* R. 77, Art. 15 Letter, but the document was of no help. It merely articulates the general principle that rights of *patria potestad* are custody rights under the Hague Convention. *Id.* at 1. It does not explain the effect of a custody order that awards physical custody to one part and visitation to the other, but the text of the order does not expressly address *patria potestas* rights. *See id.*

The second note concerns the burden of "proof." Because the burden of proving a wrongful retention—and thus, the existence of rights of custody—falls on the petitioner, the Court considered concluding that Salazar had not met his burden here. But the Federal Rules of Civil Procedure do specify that the determination of a foreign country's law "must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1. Although foreign law can be proved through methods ordinarily reserved for factual testimony like affidavits, this is not an issue of fact on which a traditional

burden should mean that the petitioner loses. *See Twohy v. Bank of Chicago*, 758 F.2d 1185, 1192-94 (7th Cir. 1985) (holding that "[t]he [district] court was correct in not dismissing plaintiff's claim merely because [plaintiff] had failed to establish relevant controlling Spanish law" and contrasting Rule 44.1 with "pre-1966 law, where questions of foreign law were viewed as issues of fact, with the party relying on foreign law carrying the burden of proof"). Ultimately, this is a question of law to which there is a "right" answer, and courts must answer it as best they can. Applying the traditional *factual*-burden rule would also mean that two trial courts presented with the same "evidence" could arrive at different outcomes and then be subject only to deferential clear-error review, so the opposite outcomes could be affirmed on appeal. The possibility of opposite results generated on the same set of evidence would undermine uniformity of the interpretation of foreign law, which is of particular importance in cases like these. The burden of proof does not, therefore, tip the scale against Salazar on this particular issue.

Moving on to the merits of the issue, it is true that the custody order awarded sole physical custody to Galvan. Custody Order at 4. But the Code of Nuevo Leon does not treat the award of physical custody to one parent as necessarily cutting off the *patria potestas* of the other: custody is distinct from *patria potestas*, and a parent without physical custody can still exert *patria potestas* over his children. Civil Code of Nuevo Leon art. 415 bis, 417. So the award of custody to Galvan does not necessarily affect Salazar's rights of *patria potestad*. Under Mexican law, a judge can limit *patria potestas* "by means of a judicial order," *id.* art. 447 bis, but

the order merely fixed in place two—of many—aspects of *patria potestas*: visitation rights and child-support payments. To be sure, the custody order does not expressly retain *patria potestas*, but neither does the order expressly extinguish the many other rights and obligations of *patria potestas*. *See* Custody Order at 3-4. And the Code of Nuevo Leon instructs that judges "may *impose* the permitted limitations to paternal authority/responsibility (*patria potestas*)" by judicial order, not that those limitations will occur simply by entry of a custody order. Civil Code of Nuevo Leon art. 447 bis (first emphasis added).

Another clue as to the impact (or lack of impact) of the custody order on *patria potestas* is the granting of specific rights of visitation to Salazar. *See* Custody Order at 4. It is true that a right of *access* is not the same as a right of custody under the Hague Convention, but that is not the relevance of the order's granting of visitation rights. Instead, the order's enshrinement of specific visitation rights (specific down to the hours of the day) provides *context* for interpreting the order and its effect on Salazar's rights. In the context of the custody order, the award of visitation rights necessarily presumes that both parents continue to have authority over the child's place of residence. Otherwise, Galvan could unilaterally render the visitation rights meaningless by relocating so far away as to effectively deny the specified visitation rights. And looming over all of this analysis is that *patria potestas* is among the "most sacred concept[s] in Mexican family law." *Lieberman*, 625 F. Supp. 2d at 1118 (citing the testimony of a Mexican attorney). So the Civil Code of Nuevo Leon, in conjunction with the custody order itself, suggest that

something more than just allocation of physical custody and visitation rights is required to extinguish this important family-law principle.

*Gonzalez* and *Ibarra* do not compel a different conclusion. *Gonzalez* held that the existence of a divorce decree, which awarded the non-custodial father visitation and *ne exeat* rights (essentially a "veto power" to prevent the custodial parent from taking the child out of the country), "eliminate[ed] any basis for relying on *patria potestas*." 311 F.3d at 946-47, 954; *see also Altamiranda*, 538 F.3d at 586 ("[A]ll that [*Gonzalez*] actually holds … is that *patria potestas* is a default doctrine and hence does not override rights conferred by a valid custody agreement between the parents."). In arriving at this conclusion, however, the Ninth Circuit did not describe the Civil Code of Jalisco (the habitual residence of the child in that case) or other applicable Mexican law in presenting its conclusion.[8] But the Hague Convention instructs that a petitioning parent's rights of custody be determined based on laws of the child's habitual residence. So this Court must look to the Civil Code of Nuevo Leon, not the determinations of American courts relying on other Mexican laws that might or might not be the same. And without a reasonable basis on which to compare the laws of Jalisco and Nuevo Leon, this Court cannot evaluate

---

[8]*Gonzalez* instead drew an inference from the First Circuit's holding in *Whallon*. *Whallon* held that, absent a custody agreement or order (there was none in *Whallon*), *patria potestas* confers rights of custody. 230 F.3d at 459. *Gonzalez* in turn tried to infer that the inverse is true: the *existence* of a custody agreement extinguishes *patria potestas*. *Gonzalez*, 311 F.3d at 954. The Ninth Circuit based this reasoning on a footnote in *Whallon*, where the First Circuit distinguished *Croll v. Croll*, 229 F.3d 133, 139 (2d Cir. 2000), a case that interpreted the laws of Hong Kong and that concluded that a formal custody order defined the rights of custody between the parties. *See Gonzalez*, 311 F.3d at 954.

whether the reasoning of *Gonzalez* applies to the determination of D.S.'s habitual residence.

There is one more problem with *Gonzalez*. It also held that the *ne exeat* right (that is, the right to prevent the custodial parent from taking the child out of the country) was not a right of custody under the Hague Convention, a conclusion abrogated by the Supreme Court in *Abbott*. *Gonzalez*, 311 F.3d at 952; *see also Abbott*, 560 U.S. at 10-22 (holding that a *ne exeat* right is a right of custody under the Convention). Supporting this now-abrogated holding was, according to *Gonzalez*, the conclusion that only an "*affirmative* right to determine the country, city, and precise location where the child will live" constitutes a right of custody under the Hague Convention. *Gonzalez*, 311 F.3d at 949 (emphasis in original). This conclusion seems to have informed the Ninth Circuit's decision on the issue of *patria potestas* as well. That is, the court implicitly concluded that physical custody—essentially, the right to *affirmatively* determine the child's place of residence—was the only right of custody recognizable under the Hague Convention. But as discussed above, physical custody and rights of custody (specifically, rights of custody recognized by the Hague Convention) are not necessarily the same thing under Mexican law. This is consistent with the Hague Convention's statement that rights of custody can be exercised "jointly or alone." Hague Convention art. 3(a). That the custody order awarded Galvan physical custody and awarded Salazar visitation does not mean that Salazar only had rights of access under the Convention. The existence of a negative right to determine the child's place of

residence or other aspects of his care, preserved through *patria potestas*, confers rights of custody under the Hague Convention. *See Abbott*, 560 U.S. at 10-22.

Galvan's reliance on *Ibarra* is also wrong. In *Ibarra*, the divorce decree at issue expressly *preserved* the father's *patria potestas* rights. 476 F. Supp. 2d at 633-34 (quoting the divorce decree as saying that "both [parties] will continue to executing their parental authority over [the child], who will be under [defendant's] custody"). This puts *Ibarra* squarely at odds with the authority—including Seventh Circuit authority—that holds that a custody order or divorce decree that expressly incorporates or preserves *patria potestas* rights affords parents the relevant rights of custody under the Convention. *See, e.g., Altamiranda*, 538 F.3d at 587. But in *Ibarra*, the court does not base its holding on the language of the divorce decree. The court instead relies on the testimony of the father, who was a Mexican attorney, that "the right of custody that I had with the minor, I left that to the mother" in determining that he had relinquished his *patria potestas* rights. *Id.* at 634. This reasoning blurs the line between the distinct concepts of custody and *patria potestad*, *see* Civil Code of Nuevo Leon art. 415 bis, 41, and, to the extent it relied on the testimony of the father as authoritative evidence of the effect of the divorce decree under Mexican law, *this* Court cannot so rely. The reasoning in *Ibarra* is therefore not persuasive.

At the time of the retention, Salazar had the rights of *patria potestas* over D.S. "The rights and duties of *patria potestas* are so extensive that a parent given them is thereby denoted a fit custodial parent," and has rights of custody under the

Hague Convention. *Altamiranda*, 538 F.3d at 587. Salazar has shown that: (1) D.S. was retained in the United States on July 21, 2014; (2) at the time of the retention, D.S.'s habitual residence was Mexico; (3) Salazar had rights of custody under the laws of Mexico; and (4) Salazar was exercising those rights of custody at the time of the retention. Salazar has established that D.S.'s retention in the United States was wrongful under the Convention.

## B. Defenses

A court's determination that a child was wrongfully removed or retained does not automatically result in the return of the child to his or her habitual residence. The Hague Convention "contains several defenses that may be asserted against a prima facie case for a return order." *Redmond*, 724 F.3d at 738 n.2; *see also* Hague Convention art. 13, 20. The parent objecting to the child's return bears the burden of proving the application of an exception by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B). Even if an exception is proven, however, "the Article 13 exceptions are permissive: a court may order return even if it finds that the parent opposing the petition has established that one of the exceptions applies." *Walker*, 701 F.3d at 1123 (citing Hague Convention art. 13; 51 Fed. Reg. at 10509).

Even if a child has been wrongfully removed or retained from his habitual residence, a court need not order return of the child if the petitioning parent "consented to or subsequently acquiesced in the removal or retention." Hague Convention art. 13(a); *see also Walker*, 701 F.3d at 1122. "The consent exception applies when a petitioning parent, either expressly or through his conduct, agrees to

a removal or retention before it takes place." *Walker*, 701 F.3d at 1122. "A parent's consent need not be formal, but it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country." *Id.* (internal quotation marks omitted). Like all exceptions under the Hague Convention, the consent defense must "be drawn very narrowly lest [its] application undermine the express purposes of the Convention." *Id.* at 1123.

Galvan argues that Salazar consented to D.S.'s retention in the United States in July 2014. The Court disagrees. Salazar agreed to allow D.S. to live in Chicago for one school year. When that year was over, D.S. could decide whether he wanted to stay in the United States or return to Monterrey. At the end of the school year, D.S. decided that he wanted to return. So based on the agreement D.S. was to return to Mexico. Salazar only agreed to allow D.S. to remain in the United States on one condition: if D.S. decided to stay at the end of the school year. That condition did not come to pass, so Salazar did not consent to the retention. This is supported by Salazar's actions in July 2014. He bought a plane ticket for D.S., and almost immediately after he returned to Mexico without his son, he initiated proceedings to have D.S. returned. Galvan has therefore failed to prove that the consent defense applies.

## IV. Conclusion

For the reasons discussed above, Salazar's petition for return of D.S. to Mexico is granted. The Court, on its own motion, temporarily stays the effect of the judgment so that Galvan has time to (quickly) decide whether she wants to appeal

and wants to move for a stay pending appeal, and to prepare that motion. To provide the most helpful briefing possible, any stay motion and response should focus on factual issues like irreparable harm (for example, would D.S. be able to return to the United States if this decision were reversed on appeal, given D.S.'s current immigration status), rather than the already-presented legal issues, which this Opinion already describes as a close call (though of course the parties are free to address the legal issues too). The Court's temporary stay expires on September 2, 2015, at 5 p.m. If a stay motion is filed before that date and time, then the response is due on or before September 8, 2015, and the temporary stay will automatically extend until the Court resolves the motion.

The Court will consider the parties' stay arguments with an open mind, but one potential course of action the parties should consider is this: the parties agree to a stay pending appeal on the conditions that Galvan very quickly file the appeal (say, in 7 days) and that Galvan agree to what would be Salazar's motion to expedite the appeal in the Seventh Circuit, with a very short briefing schedule (for example, a matter of a couple of weeks for each brief).

Lastly, as the Court has repeatedly expressed in court and in writing, recruited *pro bono* counsel for Galvan—Marc Kadish and Joseph Callaghan of Mayer Brown, and Sean Hamann of Lake Toback—as well as counsel for Salazar, Phillip Brigham, who also is not working on a retainer, have earned, many times over, the sincere thanks of the Court. The Court also thanks Ms. Colleen Littmann

and the Cook County Public Guardian for serving as the guardian for D.S., and giving him a voice in this difficult case and difficult situation.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 28, 2015